UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
 LBBW LUXEMBURG S.A.,                                        :
                                          Plaintiff,         :
                                                             :         12 Civ. 7311 (JPO)
                    -v-                                       :
                                                             :         OPINION AND ORDER
WELLS FARGO SECURITIES LLC, f/k/a                            :
WACHOVIA CAPITAL MARKETS LLC, and                            :
FORTIS SECURITIES LLC,                                       :
                                          Defendants.        :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

This case arises from Plaintiff's September 2006 investment in a collateral debt

obligation ("CDO") that was backed by securitized subprime mortgages.  Plaintiff's investment

performed poorly when the market for those securities collapsed, and Plaintiff now seeks to

recover its losses under various contract and tort theories including breach of fiduciary duty,

negligent representation, fraud, and constructive fraud.  Plaintiff, LBBW Luxemberg S.A.

("LBBW"), is a regional European bank that previously operated as Landesbank Rheinland-Pfalz

International S.A. ("LRI").  Defendant Wells Fargo Securities LLC ("Wells Fargo") is the

successor to Wachovia Capital Markets ("Wachovia"), a banking entity which, among other

functions, structured the CDO and warehoused the collateral through an affiliate.[1]  Defendant

Fortis Securities LLC ("Fortis") worked with Wachovia to solicit LRI's investment in the CDO

transaction.

Wells Fargo and Fortis have separately filed motions to dismiss, along with affidavits and

exhibits in support of those motions.  LBBW has moved to strike some of those exhibits.  For the

---

[1] The Court uses the parties' names when describing this litigation and their predecessors' names
when describing underlying facts.

reasons that follow, the motions to dismiss are granted in part and denied in part; the motion to strike is denied.

## I.      Legal Standard

Because state law claims are brought under the Court's diversity jurisdiction, federal pleading standards and New York's contract and tort laws apply.

To defeat these motions to dismiss, LBBW must satisfy the applicable pleading standards in Rules 8(a) and 9(b).  Under Rule 9(b) "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To satisfy the particularity requirement in an omission case, "the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and, (4) what defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001).

Rule 9(b) further states that "intent, knowledge, and other conditions of a person's mind may be alleged generally."  However, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent" rather than mere "speculation and conclusory allegations."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  Finally, "[w]hen fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts or omissions complained of by each defendant."  *Odyssey*, 85 F. Supp. 2d at 293.

The claims that do not sound in fraud are governed by Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U .S. 662, 678 (2009).  At this stage, a court discounts conclusory pleadings, but accepts all factual "allegations in the complaint as true and draw[s] all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted).

Furthermore, courts may consider only a limited set of information when deciding a motion to dismiss:

> a court may consider any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.

*Clopay Plastic Products Co. v. Excelsior Packaging Grp.*, 12 Civ. 5262 (JPO), 2013 WL 6388444 (S.D.N.Y. 2013) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).  Extrinsic materials are "integral to the complaint" if the complaint "relies heavily upon [their] terms and effect." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Extrinsic documents can also be integral to the complaint if they are relevant public disclosure documents and notice is provided.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).[2]  To consider additional evidence, motions to dismiss must be converted into motions for summary judgment; the parties have not requested a conversion in this case.

---

[2] "[T]he problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered . . . . Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint [the documents may be considered]."  *Cortec,* 949 F.2d at 48.

## II.      Facts Alleged in the Pleadings[3]

In September 2006, Defendants solicited and secured Plaintiff's investment in a collateralized debt obligation ("CDO") containing mortgage-backed securities ("MBSs"). In their haste, the parties failed to produce an integrated agreement setting forth the duties and risks borne by each side. Instead, marketing materials, including an initial Offering Circular (OC), dated September 8, 2006, and additional oral representations preceded LRI's commitment to invest, which was made on September 28, 2006. A second OC, dated October 24, 2006, preceded the closing two days later on October 26, 2006. A final Offering Circular (FOC) was provided November 29, 2006. This process produced conflicting promises and disclaimers that were designed to solicit investment while deflecting liability. The parties now seek to resolve through litigation the resulting uncertainty about the legal effect of those contradictory terms.

### A.      Background

Defendants played many roles in this CDO transaction. Wachovia and Fortis were responsible for marketing the CDO and securing investors. Wachovia and Fortis worked together as Placement Agents to "place" or sell the securities. A Wachovia affiliate warehoused the collateral while the Defendants solicited investors. The collateral consisted of many mortgages that Wachovia also originated and serviced. At closing, the collateral was purchased by the Issuers, special purpose entities which the Defendants created to facilitate the CDO transaction. Once it obtained the collateral, the Issuers then issued securities either to investors like LRI that had pre-committed to the securities, or to the Initial Purchasers, Wachovia and

---

[3] Throughout this opinion, this Court applies the legal standards described above, accepts well-pleaded allegations as facts, and limits its consideration to the complaint and materials that are integral to the complaint.

Fortis, which would try to re-sell the remaining securities.  Defendants disclosed these various roles to investors.

The cash flow from the underlying collateral—ultimately stemming from payments on mortgages—would be distributed in a "waterfall," starting with the top-rated debt securities ("notes"), then moving through progressively lower-rated notes, and ending with the equity securities ("shares"), if the funds reached that far.  Because the equity shares would absorb the first losses, they form an equity cushion that protects the noteholders' safer investments.  For this reason, LRI, which preferred low-risk investments and purchased notes only, cared about the value of the equity shares.

There are many ways to assess the value of a CDO share and discrepancies in valuations form one basis for Plaintiff's claims.[4]  At closing, 16,500 shares were issued at $1000 per share, suggesting that the CDO's underlying collateral was worth roughly $16.5 million.[5]  However, Wachovia internally valued the shares at only $8.6955 million on the date of closing, representing a 52.7 percent discount from the $16.5 million sale price.  Under governing accounting rules, the $8.6955 million figure represents Wachovia's best estimate for the value of shares if they were sold in "an arms-length trade in a non-distressed sale . . . within a reasonably short period of time after the [closing]."  Shortly after closing, however, Defendants published the FOC, which stated that the preference shares had been worth $27.5 million at closing.

---

[4] The shares did not have a market value because they were not openly traded.  Furthermore, prior to closing, the shares were not rated.

[5] This $1000 per share purchase price was also the stated aggregate liquidation preference ("ALP") for the shares.  ALP refers to the value that shareholders would receive if the CDO were liquidated and there was adequate capital to pay senior securities.

**B.**     **Statements in the Offering Circulars**

The September and October Offering Circulars (collectively, "Preliminary Offering Circulars"

("POCs")) are integral to the complaint and provide key facts for this analysis. [6]   The POCs

contained the following disclosures and disclaimers:

- *No Fiduciary Duty.* "[N]one of the Issuers, the Initial Purchasers, the Investment Advisor, the Trustee, the Preference Share Paying Agent, the Collateral Administrator, any Hedge Counterparty or its guarantor, the Administrator or the Share Trustee is acting as a fiduciary or financial or investment advisor for the purchaser"[7]
- "*Volatility of Collateral Assets' Market Value.* The market value of the Collateral Assets will generally fluctuate with, among other things, changes in prevailing interest rates, general economic conditions, the condition of certain financial markets, developments or trends in any particular industry and the financial condition of the issuers of the Collateral Assets."[8]
- "*Collateral Accumulation.* In anticipation of the issuance of the Securities, Wachovia Bank, N.A. has agreed to 'warehouse' all of the Collateral Assets . . . for resale to the Issuer on the Closing Date. The Issuer will be obligated to purchase the 'warehoused' assets . . . at a price determined based on such initial warehouse purchase price . . . . Consequently, the market values of 'warehoused' Collateral Assets at the Closing Date may be less than or greater than the purchase price paid by the Issuer."[9]
- *Role as Initial Purchasers.*  "As Initial Purchasers, Wachovia Securities and Fortis will sell the Securities to prospective purchasers from time to time in negotiated transactions at varying prices to be determined in each case at the time of sale in accordance with the terms and conditions described herein. "[10]
- *Independent Assessment Advised.*  "PROSPECTIVE PURCHASERS OF THE SECURITIES SHOULD CONSIDER AND ASSESS FOR THEMSELVES THE LIKELY LEVEL OF DEFAULTS ON THE COLLATERAL ASSETS. . . ."[11]

---

[6] Defendants admit that the September and October OCs were "substantially identical."  Tambe, Supplemental Declaration, at 1.

[7] September OC at *x*.

[8] *Id.* at 34.

[9] *Id.* at 19.

[10] *Id.* at 129.

[11] *Id.* at 23.

The POCs also indicated that Defendants would rely on the following representations about

purchasers such as LRI:[12]

- *Sophisticated Investor*. "[T]he purchaser is a sophisticated investor . . ."[13]
- *Access*.  "The purchaser has had access to such financial and other information concerning the Issuers and the Securities as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Securities, including an opportunity to ask questions of, and request information from, the Issuer."[14]
- *Independent Diligence*.  "[T]he purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Issuers, the Initial Purchasers, the Trustee, the Collateral Administrator, any Hedge Counterparty or its guarantor, the Preference Share Paying Agent, the Administrator or the Share Trustee;"[15]
- *Knowing Assumption of Risk*.  "The purchaser understands that an investment in the Securities involves certain risks, including the risk of loss of its entire investment in the Securities under certain circumstances . . . [and] the purchaser has evaluated the rates, prices or amounts and other terms and conditions of the purchase and sale of the Securities with a full understanding of all of the risks thereof (economic and otherwise), and is capable of assuming and willing to assume (financially and otherwise) those risks;"[16]
- *No Reliance on Outside Statements*.  "[T]he purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, the Initial Purchasers, any Hedge Counterparty or its guarantor, the Investment Advisor, the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Administrator or the Share Trustee other than in this offering circular for such Securities and any representations expressly set forth in a written agreement with such party."[17]

In addition to the warnings, disclaimers, and representations captured above, which were all

designed to protect Defendants from liability, the POCs contained the following guarantees:

---

[12] *See  Id.* at *xi* ("The purchaser understands that the Issuers, the Trustee, the Initial Purchasers, the Investment Advisor and their counsel will rely upon the accuracy and truth of the foregoing representations, and the purchaser hereby consents to such reliance.")

[13] *Id.* at *x*.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

- *Notification of Changes*. "The Initial Purchasers' obligation to sell Securities to any prospective investor is conditioned on the Securities having the characteristics described in these materials. If the Initial Purchasers determine that condition is not satisfied in any material respect, such prospective investor will be notified, . . ., and there will be no liability between the Initial Purchasers, the Investment Advisor, the Issuer, the Co-Issuer or any of their respective agents or affiliates, on the one hand, and such prospective investor, on the other hand, as a consequence of the non-delivery [of Securities which such prospective investor has committed to purchase]."[18]
- *Honestly Held Opinion*. "The Issuers, having made all reasonable inquiries, confirm that the information contained in this Offering Circular . . . is true and correct in all material respects and is not misleading, that the opinions and intentions expressed in this Offering Circular are honestly held and that there are no other facts the omission of which would make any such information or the expression of any such opinions or intentions misleading."[19]

### C.    Additional Facts

Plaintiff alleges that in accordance with prior business dealings, a contract was formed around the September Marketing Materials, the POCs, and conversations between Plaintiff and Defendants based on Plaintiff's questions about the deal.  Although the representation of no reliance on outside statements suggests that Plaintiff knew that it should not rely on oral communications, that representation also implicitly suggests that Plaintiff was invited to rely upon the representations within the POCs and other written materials.  And, to the extent that oral communications clarified ambiguities in the September OC, and formed the basis for the parties' mutual understanding of similar terms in the October OC, they may be considered.

Additionally, Plaintiff alleges that Defendants invited potential investors to ask questions about the POCs and marketing materials.  Although LRI reviewed those materials closely, they "necessarily had to rely on the information provided by the Defendants . . . as there was no other

---

[18] *Id.* at *v*.

[19]  October OC at *vii*.  The Issuers are independent from Defendants and are not parties to this litigation.  However, Defendants set up the Issuers and tendered the POCs that contained this statement.  The complaint pleads very little about Defendants' relationships with the Issuers.  Further discovery may reveal whether the Issuers' representations can be attributed to the Defendants in this case.

source for that data and model results." (Compl. at 24.)  Defendants "held themselves out as experts . . . with clearly superior knowledge" and knew that LRI lacked the analytical tools to "verify the modeling and analysis" in the marketing materials and "was necessarily relying on the information provided by Defendants" (*Id.* at 23-24).  Notwithstanding representations about its sophistication, access, independent diligence, and knowing assumption of risk, Plaintiff alleges that all parties understood that LRI was relying on Wachovia and Fortis in making its investment decision.

Finally, Plaintiff alleges that LRI was interested in making only low-risk investments, that Defendants were aware of these investment parameters, and that LRI's internal guidelines would have barred investment in this CDO had all facts been disclosed.

### D.      Alleged Misrepresentations

Plaintiff's complaint centers on the following four allegations surrounding details of the CDO transaction: (1) the Issuers purchased the collateral from the warehouser, Wachovia Bank, at an inflated price; (2) Wachovia and Fortis could not find investors to purchase all of the shares of the CDOs; (3) Wachovia purchased $55 million in CDO shares at the stated market value; and (4) Wachovia simultaneously valued the shares at only 52.7 percent of the purchase price.  LRI claims that Wachovia and Fortis knew or should have known these details, that Wachovia and Fortis had a duty to disclose them, and that LRI would not have invested had it known these details.  Based on these allegations, Plaintiff pleads fraud, constructive fraud, misrepresentation, breach of fiduciary duty, and breach of contract.  Defendants separately move to dismiss all claims.

**III.     Wells Fargo's and Fortis's Motions to Dismiss**

**A.       Breach of Contract Claims**

To establish breach of contract under New York law, Plaintiff must plead the existence of a valid contract, performance by Plaintiff, breach by Defendants, and damages. *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998). "[I]t is not necessary for each element to be pleaded individually." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).

Plaintiff alleges that the marketing materials and POCs, together with "a previously establish[ed] course of dealing and oral representations," formed an offer that was accepted upon Plaintiff's commitment to invest, thus forming a contract. (Compl. at 47.) Defendants argue that no contract existed.[20] It strains credulity to posit that $40 million was exchanged in a $150 billion transaction without any governing agreement. Furthermore, the September OC provides that "a contract of sale will come into being no sooner than the date on which the relevant class has been priced and the Initial Purchasers have confirmed the allocation of Securities to be made to such prospective investor" (at *v*). This provision implies that a contract came into being at least by the time of closing, if not earlier.

---

[20] Defendants cite *Greenapple v. Detroit Edison Co.* for the proposition that marketing materials are not themselves binding contracts. 618 F.2d 198 (2d Cir. 1980). But, as illustrated by *Greenapple* itself— a fraud case concerning alleged misrepresentations in marketing materials — marketing materials may be offers, which, once accepted, become contracts. *Id.* Marketing materials will not become contracts if they explicitly state that only the terms of a separate offering document will govern the contract. Defendants cite several cases that support this proposition. *See, e.g.*, *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, 03 Civ. 1537 (MBM), 2003 WL 23018888 (S.D.N.Y. 2003), *aff'd*, 110 F. App'x 191 (2d Cir. 2004) (ignoring terms in marketing materials that were followed by an Offering Memoranda because the marketing materials expressly disclaimed any promises not written in the Memoranda). Those cases are inapplicable here because the POCs did not contain such language and there was no separate offering document.

The contract can be loosely described as an agreement to invest in the CDO identified in the marketing materials; its precise terms must be determined through an analysis of the marketing materials, oral statements, and the established course of dealing as it was understood when the commitment was made. *See Lowenstein v. Lombard, Ayres & Co.*, 164 N.Y. 324, 333 (1900) (holding that, as a matter of evidence, juries may properly consider prior oral and written statements "for the purpose of defining the contract that was actually made").

Plaintiff performed its obligation to purchase notes. The more difficult question is whether Defendants breached any promise in the contract. Plaintiff alleges that Defendants "breached their promise to notify the Plaintiff of any change to any characteristics of . . . [the CDO's] capital structure." (Compl. at 47.) While Defendants argue that various disclaimers in the POCs negate that promise, for reasons discussed in detail below, it is plausible that Defendants did not effectively disclaim that promise. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) (holding, in the context of negligent misrepresentation, that tension between oral and written communications "cannot be resolved on the pleadings"). Therefore, this claim survives the motion to dismiss

### B.    Fraud Claim Against Wachovia (Wells Fargo)

A claim for fraud under New York law requires "[1] a material misrepresentation of a fact, [2] knowledge of its falsity, [3] an intent to induce reliance, [4] justifiable reliance by the plaintiff and [5] damages." *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012) [hereinafter *LBW*]; *see also McMorrow v. Angelopoulos*, No. 2012-03939, 2014 WL 223675 (N.Y. App. Div. 2d Dep't Jan. 22, 2014) (same). Although causation is not explicitly included as an element of fraud, New York law recognizes that "a plaintiff may recover only the actual pecuniary loss sustained as a direct result of the wrong."

*Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 271 (2010).  Therefore, "plaintiff must demonstrate that the fraudulent misrepresentation directly and proximately caused plaintiff's damages."  N.Y. Pattern Jury Instr. Civil 3:20 (citing cases).  Furthermore, where fraud is allegedly perpetrated by omission, Defendant must have had a duty to disclose the relevant fact.  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011).  Additionally, fraud claims must not be duplicative of Plaintiff's claims for breach of contract.  *First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20-21 (NY App. Div. 1st Dep't 1999).

### 1.     Material Misrepresentation

Plaintiff alleges misrepresentations or omissions regarding the following four facts: (1) Defendants' inability to sell the shares in arms-length trade; (2) Wachovia's purchase of $5.5 million in unsold shares at closing; (3) Wachovia's 52.7% devaluation of the shares at closing; (4) Wachovia's sale of collateral to the Issuers at above-par prices.  Plaintiff alleges that Defendants had a duty to disclose these facts because Defendants promised to notify Plaintiff of any changes to the CDO structure.  These allegations satisfy Rule 9(b)'s specificity requirements.  However, Defendants argue that even if the specificity requirement is met, the fraud claim fails because disclosures in the POCs explicitly addressed the alleged misrepresentations.

Regarding the first allegation, inability to sell the shares in arms-length trade, the POCs disclosed Wachovia and Fortis's role as initial purchasers and the fact that they would "sell the Securities to prospective purchasers from time to time."  This language suggests that Wachovia and Fortis would retain some shares to sell after closing, which is exactly what happened.  This

omission is not actionable because Defendants had no duty to disclose their failure to reach a goal—pre-sale of all CDO shares—that was never promised.[21]

Second, regarding Wachovia's $5.5 million purchase, such a purchase of CDO shares is inherent in Wachovia's disclosed role as an Initial Purchaser. Plaintiff's discontent stems from the allegation that Wachovia purchased the shares as a coverup. But, again, there are no allegations that suggest that Defendants had a duty to disclose their motivations when they performed the actions that were promised in the POCs. Where there is no duty to disclose a fact, the omission of that fact will not sustain a claim for fraud.

The fourth alleged omission focused on the sale of collateral to the Issuers at above-par prices. However, the POCs explicitly disclosed that the CDO Issuers would buy the collateral from the warehouser, a Wachovia affiliate, based on the warehouser's costs of obtaining that collateral, and regardless of the collateral's market value at of the CDO's closing. Thus, the discrepancy between the Issuers' purchase price and the market value of collateral was not a material misrepresentation.

The third misrepresentation, regarding Wachovia's 52.7 percent write-down of the CDO collateral's value at closing, is the gravamen of this complaint. The POCs disclosed that the market value of the collateral would fluctuate and LRI assumed the risk of ordinary market fluctuations. However, market fluctuation does not capture an instantaneous deliberate write-

---

[21] LBBW argues that Defendants should have revealed that at the time of closing they retained shares because they were unable to find purchasers and not just because it was the plan of action to sell shares "from time to time." This disclosure may have alerted LRI to the fact that the shares were overvalued. However, because Defendants were under no obligation to sell *any* shares prior to closing, they had no duty to disclose their inability to sell *all* of the shares prior to closing. If Defendants had disclosed an accurate valuation of the CDO shares, but had failed to sell some shares because of poor salesmanship, one can hardly imagine that Plaintiff would demand to know the internal workings of Defendants' operation or that Defendants would have a duty to disclose the same.

down of over 50 percent of the collateral's value at closing.  *Cf. Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 29 (N.Y. App. 1st Dep't. 2014) [hereinafter *BYAF*] (finding "a vast gap" between speculative disclosures of market deterioration and actual knowledge that such deterioration "had already occurred").  Therefore, Defendants' disclaimers are ineffective.  *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) ("[Plaintiff] adequately alleged an actionable omission because . . . the risk disclosures in the Offering Circulars were inaccurate and therefore misleading.").  The disclaimers of duties and representations of independent review go to the question of justifiable reliance; based on the facts presented here, Plaintiff has plausibly pleaded an omission or misrepresentation regarding Wachovia's valuation of the CDO collateral.[22]

Defendants contest the materiality of this alleged misrepresentation.  Determining materiality requires "a fact-specific inquiry . . . [into] whether 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to act.'"  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (internal alternations adopted)).  A "Rule 12(b)(6) motion . . . may not properly be dismissed . . . unless [misrepresentations] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (internal citations omitted).  The value of CDO equity dictates the degree to which the CDO notes are leveraged.  It is plausible that a risk-averse investor in leveraged notes would want to

---

[22] Plaintiff's theory of fraud incorporates (1) fraud by omission based upon Defendants' failure to disclose its internal valuation; (2) affirmative fraud based upon failure to correct the valuations that were previously provided; and (3) affirmative fraud based upon Defendant's promises in the POCs.  To the extent that these theories of fraud may yield different analyses, the Court considers the theory that is most favorable to the Plaintiff.

14

know that Wachovia—a party that structured the CDO and was affiliated with the originators, servicers, and warehousers of the underlying mortgages—halved the value of the collateral in an internal assessment.  Materiality is thus adequately pleaded.

### 2.     Knowledge of Falsity and Intent to Induce Reliance

Scienter requires both knowledge of falsity and a strong inference of intent to induce reliance.  A strong inference of intent can be alleged through either (1) "facts that show that the defendant had both motive and opportunity to commit fraud" or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

Wachovia steeply discounted its internal valuation of CDO shares on the same day that it issued those shares at a much higher price, and subsequently represented that the share value at closing exceeded the sale price.  These allegations create a plausible inference that Wachovia knowingly misrepresented the value of CDO shares and also constitute strong circumstantial evidence of conscious misbehavior.  *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (finding a strong inference of fraudulent intent where Defendant "knew facts or had access to information suggesting that their public statements were not accurate").

Furthermore, issues of intent and motive are typically factual inquiries that should not be decided on a motion to dismiss "unless the nonmovant has failed to [allege] any evidence . . . that the defendants acted with scienter."  *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1256 (S.D.N.Y. 1996) ("It is typically inappropriate to decide issues of intent and motive on summary judgment, unless the nonmovant has failed to adduce any evidence from which a reasonable jury could infer that the defendants acted with scienter."); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("Whether a given intent existed is generally a question of fact,

appropriate for resolution by the trier of fact.") (internal citation omitted). Accordingly, Plaintiff

has adequately pleaded scienter.

### 3.     Justifiable Reliance

Defendants argue that Plaintiff's reliance on the alleged misrepresentations was not

justified because of the disclaimers and representations of independent diligence.  A recent First

Department case is instructive.  In *BYAF*, the court held that "[t]he law is abundantly clear in this

state that a buyer's disclaimer of reliance cannot preclude a claim of justifiable reliance on the

seller's misrepresentations or omissions unless (1) the disclaimer is made sufficiently specific to

the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations

or omissions did not concern facts peculiarly within the [Defendant's] knowledge."  980

N.Y.S.2d at 28.  Because reliance on facts within Defendant's peculiar knowledge is justified

"[e]ven if the disclaimers and disclosures were . . . sufficiently specific," this Court begins its

analysis by asking whether the misrepresented facts were peculiarly within Defendants'

knowledge.  *Id.* at 29-30.

A matter is within the defendant's peculiar knowledge when the plaintiff has "no

independent means of ascertaining the truth."  *Lazard Freres & Co. v. Protective Life Ins. Co.*,

108 F.3d 1531, 1542 (2d Cir. 1997) (internal quotations omitted).  Internal proceedings and

matters of intent can qualify as peculiar knowledge even when they relate to matters of public

record.  *Todd v. Pearl Woods, Inc.*, 248 N.Y.S.2d 975, 977 (N.Y. App. Div. 2d Dep't 1964)

*aff'd*, 15 N.Y.2d 817 (1965) ("[W]here . . . facts were peculiarly within the knowledge of the

defendants and were willfully misrepresented, the failure of the plaintiffs to ascertain the truth by

inspecting the public records is not fatal to their action.").  For example, in a real estate dispute

where Defendants allegedly misrepresented the public nature of the road, a court found that

"even if the roadway's public nature was not peculiarly within defendants' knowledge, [defendants'] unsuccessful petition to have it abandoned by the Town may have been." *Kurtz v. Foy*, 884 N.Y.S.2d 498, 501 (N.Y. App. Div. 3d Dep't 2009).

Here, the Defendants, due to their various roles in the CDO transaction, had greater access to relevant facts about specific mortgages that were securitized in the CDO and about the CDO market more generally.  As in *BYAF*, the peculiar knowledge exception applies here because the defendant "had access to nonpublic information regarding the deteriorating credit quality of subprime mortgages."  980 N.Y.S.2d at 30.  Additionally, even if LRI could have accessed facts regarding the value of the CDO collateral, it could not have uncovered the discrepancy between Wachovia's internal valuation and its stated valuation of that collateral. Furthermore, if Wachovia was motivated by a desire to offload deteriorating assets, as alleged, this intent would be within Wachovia's peculiar knowledge.  In recent state and federal cases where allegations suggest that a seller intentionally misled a buyer in order to protect its own economic position, courts have been more willing to find that the seller possessed peculiar knowledge of the facts.

In *BYAF*, which involved the sale of mortgage-backed securities, the plaintiff alleged that Goldman Sachs, the seller, sold securities that it knew would fail with the intention of first reducing its exposure and then shorting those same securities.  The court applied the "peculiar knowledge exception to the disclaimer bar" because the plaintiff alleged that the defendant "had access to nonpublic information regarding the deteriorating credit quality of subprime mortgages" due to "its role as an underwriter" and because of special reports it commissioned. *Id.* at 30.  In a similar case before the Southern District of New York, the court held that the defendant had peculiar knowledge because "even a sophisticated investor armed with a bevy of

accountants, financial advisors, and lawyers could not have known that [the plaintiff] would select inherently risky underlying assets and short them." *Dandong v. Pinnacle Performance Ltd.*, 10 Civ. 8086 (LBS), 2011 WL 5170293, at *14 (S.D.N.Y. 2011).

Nor are the general disclaimers in the POCs specific enough to negate reasonable reliance on Wachovia's representation of the value of the CDO shares.  In *BYAF*, the defendant provided offering circulars which (1) advised buyers to conduct independent assessments; (2) disclosed that it would short the securities being offered; and (3) disclosed that "the residential mortgage in the United States has experienced a variety of difficulties and change in economic conditions that *may* adversely affect the performance and Market of RMBS."  980 N.Y.S.2d at 29.  Despite the explicit warning that the RMBS market was undergoing challenges, the court found justifiable reliance because the disclaimers did not address the allegations that Goldman already knew that the collateral assets had deteriorated.  *Id.*  Applying this standard, the far more generic disclaimers provided in this case fail to negate justifiable reliance as a matter of law.

Defendants rely heavily on *HSH Nordbank AG v. UBS AG*, a pre-*BYAF* MBS case in which the First Department found that reliance was not justified.  941 N.Y.S.2d 59 (N.Y. App. 1st Dep't 2012).  As the court held in *BYAF*, *HSH Nordbank* is easily distinguished from cases such as this one.  First, several of the disclaimers in *HSH Nordbank* were directly related to the alleged misrepresentation of a contested security's riskiness.  Second, the plaintiff conceded knowledge of the unreliability of credit ratings.  *BYAF*, 980 N.Y.S.2d at 30 (distinguishing *HSH Nordbank*).  Although the defendant "harbored the undisclosed intent to engage in 'ratings arbitrage,'" that omission was deemed immaterial in light of the plaintiff's admitted knowledge that the ratings were unreliable.  *HSH Nordbank*, 941 N.Y.S.2d at 64.  Because the plaintiffs

conceded that the relevant facts were matters of public knowledge, the peculiar knowledge exception was never raised.

Together, *BYAF* and *HSH Nordbank* suggest that when it comes to questions of Defendants' undisclosed intent, the efficacy of disclaimers is connected to the public or peculiar nature of the allegedly misrepresented facts. As discussed above, undisclosed intent to willfully misrepresent facts is generally deemed peculiar knowledge, although plaintiffs can waive that argument as they did in *HSH Nordbank*.

Finally, courts are more inclined to find justifiable reliance where the allegations suggest foul play. For example, the Second Circuit noted that a higher level of reliance may be justified if defendants create a sense of urgency by limiting the time-frame in which plaintiffs can review an investment. In this case, LBBW alleges that the CDO deal was rushed and left scant time for independent evaluation of underlying assets, much less evaluation of issues of intent that were peculiarly within Defendants' knowledge. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1534 (2d Cir. 1997) (noting that reliance may have been justified where plaintiff was dealing from a pay-phone and "had to act fast . . . [or] lose its opportunity to make a profit"). Similarly, *Lazard* suggests that reliance is more likely to be justified where there is an affirmative representation and not merely an omission. *Id.* at 1542. And, even if Defendants are not responsible for the Issuer's endorsement of the POCs, the inclusion of that statement in the October POC, which Defendants crafted and provided to LRI mere days before the CDO closing, justifies further reliance by LRI upon the terms in the POC.

In light of all these considerations, and the fact-specific nature of this inquiry, the Court holds that Plaintiff has adequately pleaded justifiable reliance.

4.        **Damages and Causation**

Finally, the Court considers various doctrines of causation, which "fix a legal limit on a person's responsibility, even for wrongful acts." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).  Plaintiff has pleaded that but for the alleged misrepresentations, it would not have engaged in the contested transaction.  This satisfies the requirements of actual causation.  But Defendants argue that proximate causation is lacking because of the intervening collapse of the MBS market.[23]

"Loss causation is a fact-based inquiry."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005).  If "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, loss causation is established."  *Id.* (internal citation omitted).  Generally, whether "loss was caused by an intervening event, like a general fall in the price of [securities] . . . is a matter of proof at trial and not to be decided on a . . . motion to dismiss."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Defendants' argument that the market-wide housing price collapse severs loss causation traces back to *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994).  There, the plaintiff, a lender, hired the defendant, a broker, to help it extend non-recourse loans secured by commercial rental properties.  The broker allegedly misrepresented the value of the collateral properties.  When the housing market collapsed, the plaintiff suffered losses on its non-

---

[23] Most New York State courts use the language of actual causation and loss causation, rather than the language of transaction causation and loss causation, which has developed in the context of federal securities fraud litigation.  Underneath their semantic differences, the two sets of doctrine reflect similar principles for limiting liability based on foreseeability and a reasonable relationship between alleged acts and alleged damages.

recourse loans.  To resolve the question of causation, the court considered three factors: "the magnitude of the misrepresentations, the amount of time between the loan transaction and the loss, and the certainty with which the loss can be attributed to the defendant's conduct." [24]  *Id.* at 770.

Applying the first factor, the court could not discern the magnitude of the misrepresentation of property value because the complaint "provide[d] no reliable measure" of the collateral property's actual value.  *Id.*  This pleading flaw heightened the risk that the loss was caused by market reductions in the collateral value rather than misrepresentations of that value. Turning to the second factor, the court noted that the loans had been profitable for a five-year interval "between the alleged fraud and the plaintiff's injury" and this time lapse did not "warrant the inference of a nexus."  *Id.* at 772.  Finally, the court noted that the causal link is weakened "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors."  *Id.*  The court concluded that the plaintiffs had failed to plead proximate cause based on the "cumulative effect of the considerations discussed above, rather than any single factor."  *Id.*

This case is distinguishable from the fact-specific holding of *First Nationwide Bank*. First, LBBW adequately pleaded the magnitude of Defendants' overvaluation of the CDO collateral.  The 52.7 percent discount of the collateral's value at closing presents a misrepresentation of great magnitude.  Second, the amount of time is shortened here: "the CDO transaction was in default" in "little more than a year" (Comp. at 6).  Third, in cases where a "misrepresentation of . . . the worth of the security is shown to be false, and . . . disclosure of the

---

[24] These factors "do not constitute an exhaustive list" of the "[m]any considerations [that] enter into the proximate cause inquiry." *First Nationwide Bank*, 27 F.3d. at 769-70.

falsity of the representation results in a collapse of the value of the security on the market . . . the chain of causation is clear," regardless of the time lapse between the misrepresentation and the disclosure. *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 708 (2d Cir. 1980). In such cases, the fraud is complete at the time of closing, diminishing the weight of the interval between the purchase and the loss. Although investors in a Ponzi scheme may not realize their losses until years after their initial investment, the time lapse reflects the continuing perpetration of fraud, not a break in the causal relationship between the fraud and the loss. Plaintiff sufficiently pleads that the valuation of the CDO collateral was fraudulent at the time of closing and that losses were delayed because Defendants defrauded additional investors who subsequently purchased inflated CDO shares.

Furthermore, the proximate cause determination "is not free from normative legal policy considerations," and indeed involves a judgment based upon some social idea of justice or policy. *First Nationwide Bank*, 27 F.3d at 769-70 (internal citations and quotations omitted). Here, the Court considers the fact that the market collapse in this case is not fully an external factor but is intimately connected to the type fraud that Plaintiff has alleged. Consider the extreme case: if a large-scale fraudulent act directly causes a market-wide collapse, the actor cannot argue that the market collapse is an intervening act that severs the causal chain. The reward for perpetrating systemic fraud cannot be immunization against every individual allegation of fraud. Importantly, the Second Circuit in *First National Bank* "d[id] not mean to suggest that in all cases a fraud plaintiff will be unable to plead proximate cause when the claim follows a market collapse." *Id.* at 770. Given the fact and policy distinctions in this case, the background rule that causation is a fact-based inquiry applies and the narrow holding of *First National Bank* does not.

### 5.      Duplication of Claims

Fraud claims must be dismissed as duplicative of contract claims where "the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (NY App. Div. 1st Dep't 1999). "A fraud-based cause of action may lie, however, where the plaintiff pleads a breach of a duty separate from a breach of the contract." *Manas v. VMS Associates, LLC*, 863 N.Y.S.2d 4, 7 (NY App. Div. 1st Dep't 2008).  "[I]f a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to the plaintiff's breach of contract claim." *First Bank of Americas*, 690 N.Y.S.2d at 21.

The details of *First Bank of Americas* help to resolve the issue in this case.  There, the plaintiff claimed "that defendants intentionally misrepresented material facts about various individual loans so that they would appear to satisfy . . . warranties, because otherwise plaintiff would have neither the obligation nor the desire to purchase them." *Id.*  The court found that:

> This is fraud, not breach of contract. A warranty is not a promise of performance, but a statement of present fact. Accordingly, a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim.

*Id.*  Similarly, here, Plaintiff alleges that Defendants intentionally misrepresented material facts about the CDO's value at various points prior to closing.  Those allegations support claims for fraud as well as breach of contract.[25]

---

[25] Although this case is complicated by ambiguities about whether various representations are incorporated into a contract or are collateral to the contract, those ambiguities weigh against dismissal for duplicativeness; if one cannot determine what promises comprised the contract, then one cannot say which claims sound in breach of contract and which in fraud.

In sum, Plaintiff has adequately pleaded a non-duplicative claim of actual fraud based upon Wachovia's alleged misrepresentation of the value of the CDO collateral.

### C.      Fraud Claim Against Fortis

Much of the above analysis applies equally to Fortis's motion to dismiss.  However, Federal Rule of Civil Procedure 9(b) requires allegations of fraud to be pleaded with particularity against each named defendant.  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Lobatto v. Berney*, No. 98 Civ. 1984 (SWK), 1999 WL 672994, at *9 (S.D.N.Y. 1999) ("[A] complaint may not rely upon blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the [alleged] fraud.").  Accordingly, this Court now turns to the fraud allegations against Fortis to determine whether knowledge and intent have been adequately pleaded.

### 1.      Review of Allegations Against Fortis

LBBW alleges that Wachovia and Fortis "shared data, information, and analyses of the transaction . . . [and] worked together as a seamless team."  (Compl. at 9.)  A Fortis representative participated in soliciting LRI's investment.  (*Id.* at 22.)  The POC and Marketing Materials were "clearly authored and adopted" by Fortis as well as Wachovia.  (*Id.*)  A Fortis representative and a Wachovia representative jointly met with LRI to explain the terms of the investment, and Fortis followed up with LRI to resolve additional inquires.  (*Id.* at 23.) Like Wachovia, Fortis was aware that LRI was "necessarily relying" on its representations and, like Wachovia, Fortis held itself out as an expert in this field.  (*Id.* at 23-24.)  LBBW alleges that only Wachovia recorded a deeply discounted internal valuation of the CDO collateral.  But it is plausible that Fortis, as a Placement Agent, was also aware that many shares had not been sold to arms-length investors by the closing date.  While Fortis did not have a duty to disclose this poor

sales record, this record suggests that Fortis may have known that the POCs misstated the collateral's value. Therefore, Fortis's failure to reveal any suspected changes in the CDO's valuation raises a plausible claim of a material omission.

Fortis repeatedly highlights LBBW's concession that Fortis may not have known about all of Wachovia's misrepresentations and omissions. However, symmetry of knowledge is not required. For example, Fortis may have known that the POCs misrepresented the CDO collateral's value without knowing Wachovia's internal valuation of the collateral value. Either level of knowledge is sufficient to sustain Plaintiff's claims.

### 2.      Fortis's Knowledge of Falsity and Intent to Induce Reliance

Based on the close working relationship between Wachovia and Fortis and Fortis's role in communicating Wachovia's analytics to LRI, the pleadings support a reasonable inference that Fortis knew that the POCs misrepresented the value of the CDO collateral. While it is true that one defendant's knowledge cannot automatically be attributable to the other, the complaint alleges details giving rise to a plausible inference that Fortis knew, if not everything about Wachovia's activities, at least enough to raise red flags concerning the deal.

Next, the Court examines whether LBBW has adequately pleaded intent. The allegations of conscious misbehavior or recklessness by Fortis are weaker than the allegations against Wachovia because LBBW alleges that only Wachovia wrote down the value of CDO collateral at closing. LBBW does allege, however, that Fortis "knew . . . or should have known" that representations in the POCs were false by the time of closing. (*Id.* at 35.) Fortis's close working relationship with Wachovia as well as Fortis's peculiar knowledge of market apathy toward the CDO shares at the eve of the closing make this allegation of knowledge plausible.

To satisfy the "conscious misbehavior or recklessness" standard, LBBW must allege facts that "represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  Plaintiff walks a fine line by arguing, on the one hand, that the 52.7 percent diminution in the collateral's stated value is so egregious that Fortis should have known that the POC was misleading, while maintaining, on the other hand, that even a sophisticated investor like LRI could have been justifiably oblivious to the same fraud.  However, compared to LRI, Fortis allegedly had greater expertise, a closer relationship to Wachovia, and peculiar knowledge of market conditions arising from its role as a Placement Agent.  Therefore, Fortis's actions—particularly co-issuing the October POC two days before closing—support a strong inference of conscious recklessness.[26]  *Cf. Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (finding scienter, in a PSLRA case, where a defendant allegedly deliberately misrepresented the value of inventory "with the intent to deceive the investment community").

Because the knowledge and intent requirements are met with particularity as to Fortis, and the other elements do not require separate analysis, LBBW's fraud claim against Fortis survives the motion to dismiss.

---

[26] The New York Court of Appeals has held that it is inappropriate to dismiss a fraud claim based on failure to allege with specificity facts that are likely within the defendant's peculiar knowledge.  *Jered Contracting Corp. v. New York City Transit Auth.*, 22 N.Y.2d 187, 194, 239 N.E.2d 197, 201 (1968).  And, "scienter . . . is, of course, the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof."  *Houbigant, Inc. v. Deloitte & Touche LLP*, 753 N.Y.S.2d 493, 498 (2003).

### D.       Breach of Fiduciary Duty Claims

"In New York, in order to establish a breach of fiduciary duty, there must be a fiduciary duty owed." *Summit Properties Int'l, LLC v. Ladies Prof'l Golf Ass'n*, 07 Civ. 10407 (LBS), 2010 WL 2382405, at *7 (S.D.N.Y. 2010) (citing *SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 342 (2d Cir. 2004)).  Absent an effective disclaimer, the existence of fiduciary duties is a factual question "not susceptible to resolution on a motion to dismiss." *Salomon Bros., Inc. v. Huitong Int'l Trust & Inv. Corp.*, 94 Civ. 8559 (LAP), 1996 WL 675795, at *7 (S.D.N.Y. 1996). However, no fiduciary duty is owed where explicit contractual disclaimers of fiduciary duty apply.  *See Cooper v. Parsky*, 140 F.3d 433, 439 (2d Cir. 1998); *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 313 (S.D.N.Y. 2012) (finding, in a suit regarding MBSs, that explicit "disclaimers of fiduciary duty are enforceable in New York"), *reconsideration denied*, 863 F. Supp. 2d 317 (S.D.N.Y. 2012).  In *Valentini v. Citigroup, Inc.*, the court distinguished between an effective disclaimer and a failed attempt.  837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011). The effective disclaimer contained the "clear and unambiguous" statement that "'[Defendant] is not acting as fiduciary for' the purchaser *Id.* at 326.  In contrast, an agreement that "contains no express disclaimers of fiduciary duty nor . . . disclaims[s] the general duties [of] brokers in New York" fails to disclaim a fiduciary duty, even if "[Plaintiff] expressly disclaims reliance on any investigation that [Defendant] . . . may have conducted . . . and assumed sole responsibility for determining the note to be a suitable investment.'" *Id.* Simply put, effective disclaimers must explicitly reference fiduciary duties. [27]  *King Cnty.*, 863 F. Supp. 2d at 313.

_____

[27] For further examples of effective and ineffective disclaimers, compare *King Cnty.*, 863 F. Supp. 2d at 313, 317 n.193 (invalidating a disclaimer which stated that a Defendant "expressly does not undertake to advise any investor . . . of any information coming to its attention" because

Here, the POCs' disclaimer of fiduciary duty is sufficiently explicit to negate Plaintiff's allegations that a fiduciary duty was owed. Given the explicit nature of this disclaimer and the sophisticated nature of the parties, LBBW's fiduciary duty claims fail as a matter of law.

### E.   Constructive Fraud Claim Against Wachovia (Wells Fargo)

The constructive fraud claim modifies the claim for actual fraud by replacing the scienter requirement with the requirement that Defendants maintained either a fiduciary or confidential relationship with Plaintiff. *Brown v. Lockwood*, 432 N.Y.S.2d 186, 193-94 (N.Y. App. Div. 2d Dep't 1980). As *Brown* explains:

> Constructive fraud may be defined as a breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special protection. . . . [T]he element of . . . [the defendant's] knowledge of the falsity of his representation . . . is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and therefore to relax the care and vigilance he would ordinarily exercise in the circumstances.

*Id.* at 193-94 (internal citations omitted). As established above, the POC disclaimed any fiduciary relationship. Therefore, to state a claim for constructive fraud, LBBW must plead facts that suggest that Wachovia formed a confidential relationship with LRI. Because the crux of a confidential relationship is justifiable trust, this inquiry substantially overlaps with the justifiable reliance inquiry undertaken above.

Typically, a confidential relationship involves a relationship of trust "such as parent and child, husband and wife, guardian and ward, trustee and cestui que trust, principal and agent, or

---

it "make[s] no reference to a fiduciary duty") (internal alterations adopted), with *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381 n.135 (S.D.N.Y. 2004) (upholding a disclaimer that "Each party represents to the other party [that] the other party is not acting *as a fiduciary* or adviser to it in respect of this Transaction") (emphasis added), *amended on reconsideration*, 03 Civ. 6942 (SAS), 2004 WL 2403911 (S.D.N.Y. 2004).

attorney and client." *Id.* at 195 (internal citation omitted). "[I]n purely business transactions the defendant . . . must have misled the plaintiff by false representations concerning the subject of his superior knowledge or expertise." *Id.* While confidential relationships are not commonly found in arms-length transactions between sophisticated parties, *id.*, New York courts have found even fiduciary relationships under these circumstances where a defendant "fail[ed] to give information material to a particular transaction" or gave "advice that was unsound . . . or otherwise defective when given." *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1306 (2d Cir. 2002) (internal citation omitted).

In *Lockwood*, the Second Department found no confidential relationship where the parties were both sophisticated, were engaged in an arms-length transaction, and neither party "enjoyed a position of superior knowledge or expertise." 432 N.Y.S.2d at 196. In contrast, constructive fraud was found where a bank induced a plaintiff to purchase bonds by representing "that certain bonds were 'as good as gold' and that the bank would stand by them." *Id.* at 195 (internal citation and quotations omitted).

This case falls between the two scenarios presented in *Lockwood*, and presents a close call as to whether a confidential relationship existed. In Defendants' favor, all parties are sophisticated entities engaging in an arms-length transaction, and certain representations in the POCs state that buyers must rely on their own diligence when making investment decisions. However, while the IOC explicitly disclaimed a fiduciary relationship, it did not take the additional step of disclaiming other forms of relationships that may induce reliance.[28] This case is thus distinguishable from *LBW,* where the defendant expressly disclaimed "the existence of a

---

[28] As explained in the fiduciary duty cases, waivers of duties must reference the duty to be disclaimed or be similarly explicit in order to have legal effect. *See supra*, note 27.

special relationship of trust or confidence." 478 F. App'x 679, 682 (2d Cir. 2012). Furthermore, the POC's disclaimer of reliance on outside statements implies that Defendants knew LRI would rely on representations in the POCs and marketing materials.

Absent an effective disclaimer, the existence of a confidential relationship is ultimately a "question of fact, dependent upon the circumstances in each case." *In re Brand*, 173 N.Y.S. 169, 172-73 (1918), *aff'd*, 227 N.Y. 630 (1919). Here, LBBW alleges that Wachovia had superior expertise and experience as well as special access to relevant data and models that gave it superior knowledge in this transaction. Thus, LBBW plausibly alleges that Defendants induced its investment through intentionally misrepresenting a material matter within Defendants' peculiar knowledge: Defendants' valuation of the CDO collateral. Given the generic nature of the waivers and the specific allegations of misrepresentations intended to induce reliance— including statements that Wachovia would update LRI if terms of the deal changed—the Court cannot conclude that there was no confidential relationship as a matter of law.

## F. Negligent Misrepresentation Claim Against Wachovia (Wells Fargo)

"To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given." *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 82 (S.D.N.Y. 2010) (internal citations omitted), *aff'd*, 485 F. App'x 461 (2d Cir. 2012). The Court now turns to the question whether LBBW has successfully pleaded a "special relationship," as all other elements of this claim have already been addressed.

As with confidential relationships, the existence of a special relationship is intertwined with issues of justifiable reliance. "[L]iability for negligent misrepresentation has been imposed

only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."  *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996).  New York's three-factor test for "special relationships" asks

> [1] whether the person making the representation held or appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Id.*  Strong allegations on the first and third factors can overcome weak pleading of the second, somewhat circular factor.  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001).  Additionally, as with justifiable reliance analysis, where the alleged misrepresentations regard facts peculiarly within defendants' knowledge, "disclaimers do not, as a matter of law, foreclose a negligent misrepresentation claim." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 08 Civ. 7508 (SAS), 2013 WL 837536, at *4 (S.D.N.Y. 2013).

Here, the court must draw a fine line taking into consideration Plaintiff's allegations as well as the representations in the POCs.  Regarding the first *Kimmell* factor, Plaintiff pleads that Defendants held expertise in US mortgage-backed securities that rose above and beyond Plaintiff's own expertise as a sophisticated financial actor.  Furthermore, because of its various roles in the CDO transaction, Wachovia had special access to data regarding the value of the underlying mortgages.  The first factor favors LBBW.

The second factor yields mixed results.  However, as previously discussed, LBBW has alleged enough facts to suggest that a confidential relationship may exist.  Furthermore, a special relationship is more likely to exist if the misrepresented facts were peculiarly within the Defendant's knowledge.  See *LBW*, 821 F. Supp. 2d at 624 (dismissing negligent misrepresentation claims in part because plaintiff failed to plausibly allege that misrepresented

facts were within defendant's peculiar knowledge). And Defendants' promise that they would provide notification if anything changed is particularly likely to "induce[] [Plaintiffs] to forebear from performing their own due diligence." *Suez Equity Investors*, 250 F.3d at 103. These facts counterbalance the disclaimers and representations of independent diligence in the POCs.

The third factor also favors Plaintiff. The POCs imply that LRI would rely on representations in the POCs and marketing materials, and past dealings suggest that such reliance would extend to subsequent oral communications that clarified the terms contained within those documents. Defendants may have known, as Plaintiff now alleges, that LRI was necessarily relying on its representations because it lacked the data and expertise to create its own models and analyses. Furthermore, Defendants' omission of material facts peculiarly within their own knowledge increases the likelihood that they supplied misrepresentations and incorporated the Issuers' promise of authenticity in order to induce reliance.

Finally, it is important to recall that the question "[w]hether the nature and caliber of the relationship between the parties [justifies] the injured party's reliance on a negligent misrepresentation" is a context-specific issue of fact. *Kimmell*, 89 N.Y.2d at 264. Even where disclaimers like the ones in this case factor into a court's decision to dismiss, courts uniformly reach beyond the four corners of an offer to analyze whether a special relationship existed which justified reliance on a misrepresentation. *See*, *e.g.*, *Abu Dhabi Commercial Bank*, 2013 WL 837536, at *4 (discussing the lack of direct contact between parties); *LBW*, 821 F. Supp. 2d at 624 (discussing the public availability of information about relevant MBSs). Here, considering all of the *Kimmell* factors together with the plausible allegations of peculiar knowledge, Plaintiff has adequately pleaded a special relationship.

**G.      Constructive Fraud and Negligent Misrepresentation Claims Against Fortis**

The Court now reviews the allegations regarding Fortis's peculiar knowledge to determine whether they produce different results regarding the existence of a confidential or special relationship between Fortis and LRI.  The remaining elements of the constructive fraud and negligent misrepresentation claims do not require separate analysis.

While Wachovia had greater access to the information that was allegedly misrepresented in this case, Fortis also had some information within its peculiar knowledge.  For purposes of the justifiable reliance analysis, it is irrelevant whether a particular fact was within one defendant's peculiar knowledge or the other's.  However, what Fortis peculiarly knew is important for determining whether Fortis formed a confidential or special relationship with LRI.  Fortis did not necessarily have access to Wachovia's internal valuation at the time of closing.  But, up to closing, Fortis was actively soliciting investors for the CDO.  To accomplish this task, Fortis relied on its expertise in the field as well as information provided through a close relationship with Wachovia.  Fortis was in closer contact with LRI than Wachovia was, and thus, Fortis was even more likely to have formed a relationship of trust with LRI.  This is enough for the constructive fraud and negligent misrepresentation claims against Fortis to survive dismissal.

**H.      Summary**

In sum, LBBW's breach of fiduciary duty claim fails, while the breach of contract, fraud, constructive fraud, and negligent misrepresentation claims survive against both Wells Fargo's and Fortis's motions to dismiss.

## IV.    LBBW's Motion to Strike

LBBW has also filed a motion to strike the following exhibits from the submissions accompanying Defendants' motions to dismiss:

- excerpts of the complaint dismissed in *LBW*, 478 F. App'x 679 (2d Cir. 2012);
- excerpts of the offering circular for the Davis Square Funding VI CDO; and,
- excerpts of the complaint dismissed in *HSH Nordbank AG v. UBS AG, et al.*, 95 A.D.3d 185 (1st Dep't 2012).

(Dkt. No. 52 at 2).  These exhibits are not incorporated into or integral to this complaint.[29] However, to the extent that these documents, and particularly court filings, are part of the public record, these exhibits could have been considered regardless of whether they were attached or are now stricken as exhibits.  In deciding Defendants' motions to dismiss, the Court interprets the complaint and materials integral to the complaint against the backdrop of legal precedents and the public record in those cases.[30]  The Court finds that the exhibits were "attached to provide judicial notice" of facts already within the public record, and did not draw any evidentiary or "factual inferences contrary to . . . the complaint" from those exhibits (Dkt No. 55 at 5).  Therefore, the motion to strike is denied as moot.

---

[29] *See* Section I, *supra*.

[30] Additionally, the Court conducts this analysis with guidance from the party's briefing *on the motion to dismiss* and therefore ignores additional briefing lodged with the motion to strike.

## V.      Conclusion

For the foregoing reasons, Defendants' motions to dismiss are denied with respect to LBBW's claims for breach of contract, fraud, constructive fraud, and negligent misrepresentation and are granted with respect to LBBW's claims for breach of fiduciary duty.  LBBW's motion to strike is denied.

The Clerk of the Court is directed to close the motions at docket numbers 38, 41, and 52.

SO ORDERED.

Dated: March 31, 2014
       New York, New York

_____
          J. PAUL OETKEN
     United States District Judge