UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
 LBBW LUXEMBURG S.A.,                       :
                                             :
                      Plaintiff,      :
                                             :            12-CV-7311 (JPO)
              -v-                  :
                                           :         OPINION AND ORDER
WELLS FARGO SECURITIES LLC, f/k/a    :
WACHOVIA CAPITAL MARKETS LLC, and  :
FORTIS SECURITIES LLC,             :
                                           :
                      Defendants.  :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

       Plaintiff LBBW Luxemburg S.A. ("LBBW") brought suit against Defendants Wells

Fargo Securities LLC ("Wells Fargo"), the successor to Wachovia Capital Markets

("Wachovia"), and Fortis Securities LLC ("Fortis"; collectively with Wells Fargo,

"Defendants").  On March 31, 2014, this Court granted in part and denied in part Defendants'

motions to dismiss, keeping alive one theory of liability advanced by LBBW.  (Dkt. No. 56.)

Following discovery, Defendants moved for summary judgment on LBBW's remaining claims,

additionally challenging LBBW's standing to maintain the suit.  (Dkt. No. 213; Dkt. No. 214.)

This Court heard oral argument on February 10, 2017.  For the reasons that follow, Defendants'

motions for summary judgment are granted.

## I.    Background

       Familiarity with the background of this case is presumed and detail is provided in this

Court's earlier Opinion and Order, granting in part and denying in part Defendants' motion to

dismiss.  *See LBBW Luxemburg S.A. v. Wells Fargo Secs. LLC*, 10 F. Supp. 3d 504 (S.D.N.Y.

2014).  The facts, as recounted here, are taken from the parties' 56.1 Statements and responses

(citations are to the last such Statement filed, Docket Number 226 ("SOF")), and are undisputed unless otherwise indicated.

As relevant to the pending motions for summary judgment, the Grand Avenue II ("GA II") CDO—for which Wachovia and Fortis served as "Initial Purchasers," purchasing and then re-selling the issued securities to sophisticated parties, including LRI (an investment arm of LBBW, or one of its related entities)—issued several tranches of Notes, with varying degrees of seniority, that had recourse to the income generated by the CDO's underlying portfolio of assets. (SOF ¶¶ 21-23, 30, 42, 65-66.)[1]

In denying in part Defendants' earlier motions to dismiss, this Court held open a single theory of the case: that Wachovia's internal markdown on GAII's Preference Shares supported a misrepresentation, and thus a fraud or negligence claim, against Defendants or a breach of contract claim against Wachovia.[2]

The unrated Preference Shares represented the bottom one percent (in terms of payment priority) of GAII's issued securities; these shares were equity stakes and thus were not secured by income on the CDO assets and did not enjoy a fixed coupon payment (though they received

---

[1]    TCW, which is not a party to this litigation, acted as the CDO's investment advisor and, as such, vetted and selected the portfolio of assets underlying GAII at closing. (SOF ¶¶ 13-15, 71.) LBBW concedes that it has not identified a "breach" in TCW's vetting and selecting of the assets. (SOF ¶¶ 17, 73.) As disclosed in the Offering Circular, Wachovia was required to sign off on the asset purchases. (SOF ¶ 177.)

[2]    This last theory, in particular, relied on discovery's bearing out an allegation levied in LBBW's complaint that it had relied on representations or promises made by Defendants outside the four corners of its marketing materials (since, as discussed in this Court's earlier Opinion and Order, there was no contract drawn up between the parties governing the terms of the sale). *See LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 509-10, 513-14. But discovery has not produced evidence of any such promises. (*See, e.g.*, SOF ¶ 76.) Therefore, marketing materials, most significantly the terms of the CDO Offering Circular (which the parties agree were "substantially identical" to those of the preliminary circular (SOF ¶ 80)), govern Defendants' obligations to LBBW. *See LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 509.

dividends).  (SOF ¶¶ 24-27.)  According to the Offering Circular ("OC"), issued in October

2006,[3] the 16,500 Preference Shares each had a "technical par value" of $0.01 and an aggregate

liquidation preference of $1,000 per share; but, because of the waterfall of payments, in the event

of CDO liquidation, the actual amount a holder of the Preference Shares would receive would

depend on the amount of cash remaining after the senior Notes had been paid in full.  (SOF ¶¶

28-29.)  As such, the Offering Circular was explicit that the market for and price of the

Preference Shares were separate from the market for and price of GAII's rated notes: The

Preference Shares would not necessarily find a market with investors; and they could be sold at

different prices.  (SOF ¶ 49; *see also* Dkt. No. 217 Exs. FF, PP (illustrating the difference

between Wachovia's representations as to the notional size of the Preference Shares and the price

of the senior Notes).)[4]  (LBBW contests this point, arguing that Wachovia advertised the

Preference Shares as having a fixed value, but the evidence to which LBBW points circles back

to the liquidation preference of $1,000 per share, does *not* indicate the price or market value of

the Preference Shares, and ignores the $0.01 "par value."  (*See* Dkt. No. 217 Exs. FF, OO, and

PP.))

---

[3]        Although there were different versions of the Offering Circular, one preliminary
and one final, the parties agree that the terms of these Circulars were "substantially identical."
(SOF ¶ 80.)  Throughout this Opinion and Order, therefore, the Court refers only to the terms
of the October Offering Circular as governing the parties' obligations and understandings.

[4]        LBBW disputes this representation's relevance, insofar as it contends that
Defendants represented, at closing, that the CDO was fully funded.  (SOF ¶¶ 225-27.)
Defendants counter that the representation as to the full funding of the CDO spoke to the more
than $1.5 billion in cash, exceeding the $1.5 billion in underlying assets.  (SOF ¶¶ 38-42.)  At the
date of closing, then, the capital structure was "fully funded" in that, if liquidated, the CDO
would have enough to cover not only all the tranches of Notes but also the Preference Shares at
the $1,000 per share price.  (SOF ¶ 39.)

Beyond making representations as to the price of Notes and notional size of the Preference Shares, the Offering Circular provided that, among its underlying assets, GAII would include "Synthetic Securities" (including, for example, credit default swaps on asset-backed securities), for which Defendants, as Initial Purchasers, could act as a counter-party.  (SOF ¶ 113.)  The OC also made clear that Wachovia would enter "short" positions, through credit default swaps, which it did at closing, for eight bonds that made up the CDO's Synthetic Securities.[5]  (SOF ¶¶ 117-18.)  LBBW contests this point, insofar as it maintains that the OC did not reflect the possibility that Wachovia would be *net* short.  (SOF ¶¶ 117-18.)  But, in 2006 and 2007, Wachovia entered additional long positions referencing the same eight bonds, and, according to documents produced in discovery, by February 2007, it was net *neutral*—that is, completely hedged—with respect to these assets.  (SOF ¶¶ 119-20.)[6]

While the Offering Circular made clear that prospective investors would be "notified" if the securities' "characteristics" (such as its structure or composition) changed between

---

[5]    The OC additionally stated that Defendants could take other positions (including hedges), beyond those expressly spelled out, and that these additional positions could create apparent or actual conflicts of interest.  (Dkt. No. 217 Ex. A at 41.)

[6]    LBBW further contests this fact, representing that Wachovia has "refused to produce the accounting and profit and loss statement documents that would show" additional positions held and might demonstrate a net short position.  (SOF ¶ 119.)  To this end, LBBW moved for discovery sanctions against Wachovia for failing to turn over its "prop book."  (*See* Dkt. No. 179.)  This Court ultimately vacated sanctions issued by Magistrate Judge Fox in connection with the motion (Dkt. No. 275), and Wachovia subsequently made clear that references to an outstanding "prop book," for which LBBW had been searching, referred not to a physical book, log, or specific statements that had not been produced, but rather to Wells Fargo's proprietary trading positions (Dkt. No. 305 at 23-25).  Following this representation, LBBW has not, as required—where the plaintiff has been given the opportunity to conduct discovery, and "even where the evidence is *likely* to be within the possession of the defendant"—put forward sufficient "affirmative evidence" to defeat Defendants' showing that Wachovia was apparently net neutral with respect to these individual bonds.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (emphasis added).)

4

commitment date and closing, it disclaimed any obligation to "update or otherwise revise any *projections*, including any revisions to reflect changes in the economic conditions or other circumstances." (SOF ¶¶ 52, 90 (emphasis added).)

Any investor hearing Defendants' pitch for GAII was a "sophisticated" one—and LRI was no exception. (SOF ¶ 58.) LRI's parent company was an international commercial bank, and LRI, as its investment arm, entered CDS positions regularly. (SOF ¶¶ 7, 65-66.) But just how much it could or did rely on Defendants' representations was left open by this Court following the 12(b)(6) motions in this matter as an element of LBBW's fraud, constructive fraud, and misrepresentation claims that could be borne out by discovery. *See LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 517-19. As far as questions that LRI wanted answered, the firm was particularly interested in a security that would be low-risk, which Defendants represented was true of the tranches of senior Notes that LRI expressed interested in. (SOF ¶¶ 144-81.) To that end, LRI engaged in some modeling of its own, including stress tests that, together with other "standard" scenarios, modeled a 30% principal loss in the CDO's portfolio of assets, which would completely wipe out of the Preference Shares, and even the AA-rated Aa2 Notes. (SOF ¶¶ 83-86.) At the same time, LRI expressed that it was relying on Defendants for some analytics and information on GAII because of their expertise and the tight time frame of the GAII placement. (SOF ¶¶ 45-46, 57-60.) (LBBW admits that Defendants never refused to provide the requested models or analysis. (SOF ¶ 89.))

Ultimately, on or around September 28, 2006, LRI committed to purchase $25 million of Class A-1A Notes, $10 million of Class A-1B Notes, and $5 million of Class A-2 Notes. (SOF ¶ 102.) LRI did not purchase—and there is no representation that it ever considered purchasing—the GAII Preference Shares. (SOF ¶ 105.)

At closing, the Initial Purchasers bought the GAII Preference Shares as planned. Wachovia sold about two-thirds of the Shares to various purchasers at various prices,[7] and retained about one-third of the Preference Shares on its own books.  (SOF ¶¶ 37, 123.)  Central to LBBW's surviving theory of the case, Wachovia marked those shares internally at about 40.9% before closing and then at about 52.7% at closing.  (SOF ¶¶ 126-38.)  The reason for the markdown is the main contest between the parties.

On one hand, LBBW insists that the markdown was a required "mark-to-market" that reflected Wachovia's true view of the value of the Preference Shares and, by extrapolation, GAII's underlying assets generally.  As an extension of this theory, LBBW argues that the markdown of the Preference Shares was a "red flag," not only regarding the market price of the Preference Shares, but also regarding the fundamentals of GAII's portfolio of assets.  (*See* SOF ¶ 224.)  In short, LBBW argues that Wachovia marked down the Preference Shares because it believed GAII was in trouble.

Defendants, on the other hand, offer a different explanation.  Wachovia's internal models (which were used to justify the markdowns) indicate that the markdown of the Preference Shares, in fact, anticipated "*no defaults* on the underlying portfolio," and thus did not reflect a dim view of the underlying assets.  (SOF ¶¶ 128-29, 131-34 (emphasis added).)

As documents unearthed during discovery demonstrate, unrelated to any view of the general health of GAII's portfolio of assets, the precise markdowns were calculated to offset the fees that Wachovia anticipated taking in as a result of its placement of GAII.  Initially, Wachovia anticipated approximately $3.25 million in fees, and marked the Preference Shares it was holding

---

[7]     In a separate action, the SEC investigated the sale of Preference Shares to the Zuni Indian Tribe at a mark-down of 90%, which represented a mark-*up* compared to Wachovia's internal valuation.  (SOF ¶¶ 125-26, 128-29.)

on its books at about 41% of the aggregate liquidation preference, an estimated loss that perfectly offset the recouped fees.  (SOF ¶¶ 123-25.)  Wachovia's internal emails reveal that tethering the markdown to the fees amounted to a conservative accounting strategy to appropriately manage the risk of carrying the relatively illiquid GAII Preference Shares on its books—that is, to prevent a potential loss on its books when, in the future, it ultimately sold the Preference Shares.  (SOF ¶ 125; Dkt. No. 217 Exs. U-Z.)  This theory finds further backing in Wachovia's second markdown on the Preference Shares.  When Wachovia's fee calculation from the GAII placement was later reduced to $2.6 million, the markdown on the Preference Shares increased, to "just north of 50%" at closing; this new markdown, multiplied by the value of the Preference Shares Wachovia was holding, constituted an estimated loss that exactly offset the new fee calculation.  (SOF ¶¶ 132-34.)  While the markdown on the Preference Shares was apparently driven by the GAII placement fees, the internal mark was lent support—reverse engineered, within the metes and bounds of generally accepted accounting principles—by internal modeling that drew, in part, from other comparable transactions (such as the Preference Shares of a different CDO on which Wachovia had bid the month before).  (SOF ¶ 129.)

The rest, as they say, is history.  In 2008, the financial crisis hit.  Mortgage-backed securities tanked.  And CDOs composed of those assets similarly suffered.  GAII went into default, and LRI lost its investment.  (SOF ¶¶ 139-40, 149.)

LBBW initiated this lawsuit in 2013, claiming that Defendants had engaged in fraud, constructive fraud, negligent misrepresentation, breach of fiduciary duty, and breach of contract. The initial complaint advanced multiple theories of wrongdoing, but, as discussed above, only one has survived to summary judgment.

The remaining issue in the case is whether Wachovia's internal markdowns of the Preference Shares, before and at closing, were motivated by some doubt about the health of GAII's underlying investment portfolio. LBBW argues that Wachovia's taking some short positions vis-à-vis the Synthetic Securities lends additional support to the claim that Defendants privately held a dim view of GAII's portfolio. The Court kept alive the claims against Fortis based on the theory that Fortis shared data and collaborated with Wachovia in issuing GAII, such that discovery might uncover wrongdoing on its part. Defendants now move for summary judgment.

## II.     Standing

As a threshold matter, Defendants contest LBBW's standing to maintain this action on two grounds: first, that LBBW cannot show, per Luxemburg law, that it took the measures required of an S.A. (its corporate form) to authorize this suit in the first instance; and, second, that LBBW cannot show, following its ostensible merger with LRI's parent company, that the new entity actually acquired the interest in this suit necessary to maintain it. As an additional procedural matter, Defendants argue that LBBW's failure to object to an earlier determination by Magistrate Judge Fox that Landesbank Baden-Württemberg could not be substituted for LBBW to maintain the action is the final death knell to its ability to bring this case.

A plaintiff bears the burden of establishing standing. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 446 (S.D.N.Y. 2012). Here, it is uncontested that, since 2014, after a merger, LBBW, the named Plaintiff, has "cease[d] to exist" and is no longer listed on the Luxemburg register of companies. (SOF ¶ 8; Dkt. No. 92 at 2.) Where a company ceases to exist following a merger under the governing law, the action should be dismissed for lack of standing, unless it can be shown that the successor entity was assigned the litigation

rights to the case at bar. *See MPEG LA, L.L.C. v. Toshiba Am. Info. Sys., Inc.*, No. 15 Civ. 3997, 2015 WL 6685523, at *6 (S.D.N.Y. Oct. 29, 2015) (collecting cases). And, consistent with its obligation to demonstrate standing, a plaintiff bears the responsibility to demonstrate that the successor company was assigned the cause of action at issue. *See Abu Dhabi*, 888 F. Supp. 2d at 447-48.

Under Federal Rule of Civil Procedure 17(b), the capacity of a corporation to sue or be sued is determined by the law under which it was organized. Fed. R. Civ. P. 17(b). Upon consideration of a second motion to substitute, Magistrate Judge Fox held that LBBW had "failed to show what law governs the transfer of claims at issue here, and its conclusory allegations . . . are insufficient to establish that the instant litigation rights were transferred by the plaintiff to Landesbank Baden-Württemberg. The plaintiff failed to show that, in the circumstance of this case, the merger by absorption included the transfer of litigation rights as part of the transfer of 'all assets and liabilities,'" including the right to bring and maintain this suit. *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, No. 12 Civ. 7311, 2016 WL 3080723, at *6 (S.D.N.Y. May 13, 2016). As a result, Magistrate Judge Fox held that Landesbank Baden-Württemberg could not be substituted for LBBW. LBBW failed to object to this ruling in a timely manner. Magistrate Judge Fox's holding—as to the appropriateness of substitution and as to the failure to demonstrate the assignment of litigation rights—is law of the case and cannot now be challenged.

Rather than directly confront Defendants' arguments under Rule 17(b), LBBW counters with Federal Rule of Civil Procedure 25(c)'s permissive substitution rule and asks that the Court allow this suit to proceed under that Rule instead. LBBW has admitted that, following its delisting from Luxemburg's register of companies, the named Plaintiff is "not an entity with

9

capacity to sue now," under the relevant law.  (*See* Dkt. No. 305 at 16:7-8.)  But it argues that, under Rule 25, it should be allowed to continue.

Rule 25(c) provides, in relevant part: "If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  Fed. R. Civ. P. 25(c).  To support its proposition, LBBW leans on a decision out of the Eastern District of New York, *Patsy's Italian Restaurant Inc. v. Banas*, No. 06 Civ. 0729, 2008 WL 495568 (E.D.N.Y. Feb. 20, 2008).  But there (as in other relevant precedent), unlike here, it was "undisputed that . . . a transfer [of the relevant interest to maintain the suit] in fact occurred."  *Id.* at *2.  The facts thus satisfied an underlying premise of Rule 25(c)—that, as an initial matter, the interest in the litigation was, in fact, transferred.  But here, as already discussed, Magistrate Judge Fox held that LBBW had failed to make such a showing and denied a motion for substitution on that basis.  *See LBBW Luxemburg S.A.*, 2016 WL 3080723, at *6.  LBBW's appeal to Rule 25(c) is, therefore, unavailing.

In addition to failing to demonstrate its ability to maintain this suit, LBBW has also failed to overcome the motions for summary judgment on the merits, as discussed below.

## III.    Defendants' Summary Judgment Motions

### A.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute is "genuine" if, considering the record as a whole, a rational jury could

find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

A movant bears the initial burden of providing evidence on each material element of its

claim or defense. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

The non-moving party must then respond with specific facts demonstrating that there are

remaining issues for trial. *Ricci*, 557 U.S. at 586 (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986)). The non-moving party gets the benefit of having all "inferences to be drawn

from the underlying facts contained in such materials . . . viewed in the light most favorable" to

it. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). But, in order to make the required showing,

"[t]he nonmoving party must advance more than mere 'conclusory statements, conjecture, or

speculation.'" *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 Civ. 4062, 2013 WL

372149, at *6–7 (S.D.N.Y. Jan. 31, 2013) (quoting *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir.

1996)).

### B.    Discussion

In keeping LBBW's claims alive in its March 31, 2014 Order and Opinion, the Court

narrowed the case to a single theory: that Wachovia's internal markdown of the GAII Preference

Shares signaled a potential misrepresentation or omission to purchasers of other of GAII's

securities, including LRI. *LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 515-17 (describing

Wachovia's steeply discounting its internal valuation of CDO shares on the same day that it

issued the shares as supporting a plausible inference that Wachovia knowingly misrepresented

the value of CDO shares and constituting strong circumstantial evidence of conscious

misbehavior). Summary judgment is appropriate where there is an absence of concrete evidence

to support an essential element of the plaintiff's claim. *See Codiano v. Metacon Gun Club, Inc.*,

575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322-23); *Wagner v. JP Morgan Chase Bank*, No. 06 Civ. 3126, 2011 WL 856262, at *6 (S.D.N.Y. Mar. 9, 2011).

Here, as laid out above, discovery has not produced evidence to connect the markdown to any secretly held view by Defendants that GAII's portfolio of assets was in trouble. The internal markdown at closing, to just north of 50%, and the earlier markdown to just over 40%, instead find justification in the fees Wachovia anticipated taking in, and actually took in, as a result of placing GAII's securities.  Wachovia's internal emails, produced during discovery, reveal that the markdowns were engineered to offset the profits generated by the GAII fees (*see* Dkt. No. 217 Ex. X (stating the aim of the markdown is to "driv[e] the upfront fee to zero" and that "[t]he retained equity can help . . . pay for negative carry from CDS trading"); *id.* Exs. U, V (explaining that Wachovia is "holding fees against" the Preference Shares); *id.* Ex. W ("confirm[ing] . . . the 'gross' p[rofit] & l[oss] numbers . . . before . . . net[ting] out the writedown on our equity position" with the "actual fee wire")), so as to mitigate Wachovia's risk in carrying relatively illiquid assets, the Preference Shares, on its books (*id.* Ex. S (characterizing the Preference Shares as "extremely illiquid")).  It is no surprise, then, that the estimated "loss" from the Preference Share markdowns perfectly matches, down to the decimal, the profits generated by the GAII placement fees. [8]

---

[8]  The proof is in the pudding.  When Wachovia believed it would recognize $3.25 million in fees from GAII placement, it assigned a mark of 40.87 to the Preference Shares it retained on its books.  $5.5 million (in retained Preference Shares) multiplied by the "loss" derived from the 40.87 markdown, 59.13% (that is, 100% minus the 40.87% markdown), equals exactly $3.25 million.  The math means that the profits and losses would net out for accounting purposes, allowing Wachovia to avoid potentially recognizing a loss when it ultimately sold the Preference Shares.  When the fee estimate on GAII dropped to $2.6 million, the internal markdown changed to 52.7%.  Repeating the multiplication—(100%-52.7%) x $5.5 million— yields exactly $2.6 million.  Again, the markdown allowed the Preference Shares to defer completely Wachovia's income from fees.  (SOF ¶¶ 128, 132-33; Dkt. No. 217 Exs. Y, Z.)

In sum, the undisputed evidence shows that Wachovia's "conservative" accounting (*see* SOF ¶ 125)—which deferred recognition of the GAII placement fees until the Preferences Shares were sold—amounted to insurance that Wachovia would not ultimately carry a loss on its books when the day came to sell the Preference Shares (at varying prices to various buyers, per the terms of the Offering Circular). In this respect, Wachovia's practice is not inconsistent with LBBW's ostensibly alternative theory that any internal markdown was a "mark-to-market" (SOF ¶ 224), insofar as Wachovia sought to reflect, for internal accounting purposes, the potential risk of the Preference Shares' immediate illiquidity—a risk that was both particular to GAII's Preference Shares and explicitly disclosed to investors in the Offering Circular. (Dkt. No. 217 Ex. A at 18.)

But, even crediting this version of the "mark-to-market" theory, the facts fall well short of any suggestion that Wachovia privately believed there was anything awry with the Preference Shares themselves (rather, as disclosed in the Offering Circular, the market was illiquid and could be risky for that reason), let alone GAII's underlying collateral. In fact, internal modeling produced during discovery further reveals that a key assumption of Wachovia's markdowns at the time was that there would be "no defaults on the underlying portfolio." (SOF ¶¶ 128-29, 131-34.)

In the face of overwhelming evidence that the internal markdowns were justified by Wachovia's intake of fees in combination with the Preference Shares' disclosed illiquidity, LBBW attempts to revive its sole surviving theory by arguing, additionally, that Wachovia had a secret shorting strategy, betraying its dim view of the portfolio's performance. But discovery has produced undisputed evidence of offsetting long positions. (SOF ¶¶ 117-20.) And LBBW's

arguments that outstanding or unproduced records could demonstrate a more nefarious shorting strategy are unpersuasive.

Because, at bottom, LBBW's single surviving theory of liability is unsupported by the record, its claims cannot survive summary judgment. The Court now discusses each of those claims in turn.

### 1. Fraud Claim Against Wachovia (Wells Fargo)

In order to prevail on a fraud claim under New York law, a plaintiff must show, by clear and convincing evidence, *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007): "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon net it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury," *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d. Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996)).

The sole remaining theory of Defendants' misrepresentation or omission to investors, including LRI, relies on a disparity between their public risk disclosures and their private view, based on non-public information, of specific risks associated with the investment in question. *See, e.g.*, *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) ("[R]isk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made."); *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011) ("[G]eneral risk disclosures in the face of specific known risks which border on certainties are not sufficient to defeat a securities fraud claim." (internal quotation marks and citation omitted)).

Thus, in order to survive a motion for summary judgment, LBBW must point to "evidence, beyond mere speculation, sufficient to demonstrate 'singularly prohibitive risks' of which Defendants were aware and which they failed to disclose" in the Offering Circular or other representations. *Dodona I, LLC v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 513-14 (S.D.N.Y. 2015) (collecting cases and explaining that courts are reticent to impose disclosure duties based on internal projections, in particular, where those predictions were not based on "existing negative factors" about the securities that were known exclusively to the defendant). As explained above, the basis on which this Court held that LBBW had stated a claim was that the very fact of Wachovia's internal markdown of GAII's Preference Shares could support an inference that Defendants had non-public knowledge of an underlying weakness in the collateral, which would ostensibly materialize during discovery.

As an initial matter, Defendants' risk disclosures in connection with GAII made clear that the Preference Shares—the sole subject of the internal markdown—carried particular price instability risk that did not apply to the senior Notes.  For example, the Offering Circular expressly stated that the Preference Shares would be sold at varying prices and should be particularly scrutinized by investors.  (Dkt. No. 217 Ex. A at 18.)  The OC further warned that any prospective investor should "make its own evaluation of the yield that it expects to receive on the Preference Shares."  (*Id.*)  It additionally explained why a markdown on the Preference Shares could be justified (due to illiquidity, creating price volatility) without any disruption to the Notes or the underlying collateral.  (*Id.* ("The Preference Shares represent a leveraged investment in the underlying Collateral.  Therefore, it is expected that changes in the value of the Preference Shares will be greater than the change in the value of the underlying Collateral Assets

. . . .").)   These risk disclosures regarding the pricing of the Preference Shares in particular,

mitigate the importance of the *fact* of the internal markdown.

But, more critically, Defendants' disclosures of risk as to the CDO and the Preference

Shares are not belied by any evidence that Defendants knew of any other significant or specific

risks regarding the securities.  LBBW's surviving theory of misrepresentation or omission—that

Wachovia's internal markdown "indicate[d] a severe credit problem" with the CDO collateral,

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, No. 12 Civ. 7311, 2015 WL 1433373, at *2

(S.D.N.Y. Mar. 30, 2015) (citation omitted)—is unsupported by the record, as discussed above.

To the contrary, it is beyond genuine dispute that the markdowns can be satisfactorily explained

only by reference to the disclosed illiquidity of the Preference Shares, in combination with

Wachovia's realized fees.  Defendants' representations of the characteristics (and generic risks)

of the GAII securities (and its Preference Shares) were therefore not "misleading . . . and cannot

support an actionable omissions theory."  *Dodona I, LLC*, 132 F. Supp. 3d. at 515 ("Plaintiffs

have not shown evidence, beyond mere conclusory allegations, that Defendants concealed

investment risk."); *see also IKB Int'l S.A. v. Bank of Am. Corp.*, 584 Fed. App'x 26, 28 (2d Cir.

2014); *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 623

(S.D.N.Y. 2011) (dismissing complaint alleging that defendants concealed risk when complaint

failed to provide specifics of "how any of [defendants'] statements were false"), *aff'd*, 478 Fed.

App'x 679 (2d Cir. 2012).

LBBW has not presented "affirmative evidence" indicating a genuine issue of material

fact as to Wachovia's markdowns of the Preference Shares.  *See Anderson*, 477 U.S. at 257.

Considering analogous claims, courts in this District have granted defendants' motions for

summary judgment in closer cases.  In *Dodona I, LLC*, for example, a court in this District found

summary judgment appropriate to dismiss fraud claims even though defendants' internal communications referred to similar securities as "lemons," and made clear that defendants had a bearish view of the asset class generally. *Dodona I, LLC*, 2015 WL 5444110, at *6 ("Such emails are not enough to support a finding, at this stage, that Defendants made actionable omissions; those emails show, at most, that some . . . employees, based on the same information available to the Plaintiffs, were bearish on the RMBS market."). But discovery in this case has not turned up even *generalized* skepticism about CDOs, let alone specific concerns about GAII.[9]

LBBW further attempts to revive its claims by introducing additional theories: a "shorting strategy" undertaking by Wachovia, and a "veto" over the selection of GAII securities. But these theories are unmoored from the pleadings and contravene the clear direction of this Court that LBBW's sole surviving theory after the motions to dismiss would be based on the markdown of the Preference Shares. *See, e.g.*, *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" (quoting *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997)), *aff'd*, 445 F. App'x 389 (2d. Cir. 2011).

Even if LBBW's alternative theories are entertained, however, they do not save its claim. LBBW argues that Wachovia's secret "shorting strategy" betrays that Defendants had a

---

[9]     LBBW attempts to resuscitate its case by arguing that the 52.7% markdown at closing—the alleged smoking gun of the complaint—was, in fact, "secondary" to the "*even lower*" markdown to 40.87% prior to closing. (Dkt. No. 215 at 8 (emphasis added).) But, as discussed above, the revelation of the double markdown, in fact, cripples LBBW's argument because the precise calculus of the two markdowns can be engineered solely with reference to Wachovia's anticipated and actual fees from placing GAII.

pessimistic view of the collateral, expressed both through planned and actually assumed short positions regarding some GAII assets.  (Dkt. No. 215 at 11; SOF ¶¶ 249-53.)  But the record as a whole, as discussed above, reveals that these short positions were offset by long positions, which LBBW cannot effectively contest.

And LBBW's additional theory that Wachovia had a "secret veto power" over GAII's selection process (*see* Dkt. No. 215 at 10) is unsupported by any evidence that such a veto was, in fact, exercised.  (*See* SOF ¶ 177 (excerpting statements from depositions that a subsidiary of Wachovia could decline assets in its role as GAII's "warehouse provider," but failing to identify any instances of such a "veto"); Dkt. No. 217 Ex. A at 20, 41-42 (demonstrating that the OC disclosed that the investment advisor and "warehouse provider" must agree on the price of individual assets); *id.* Ex. N at 39:15-40:3 (indicating there were no instances in which the warehouse provider actually failed to include an asset selected by the investment advisor); *see also supra* note 1.)

Because LBBW cannot point to specific evidence as to a misrepresentation or material omission on Wachovia's part based on the single surviving theory, its fraud claim cannot survive summary judgment.  The Court need not reach the other factors.

### 2.    Constructive Fraud and Negligent Misrepresentation Claims Against Wachovia (Wells Fargo)

"[A] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on that information."  *Mandarin Trading Ltd. v. Wildenstein*, 919 N.Y.S.2d 465, 470 (N.Y. 2011) (quoting *J.A.O. Acquisition Corp. v. Stavitsky*, 831 N.Y.S.2d 364, 366 (N.Y. 2007)).  Similarly, constructive fraud requires a plaintiff to show that: "(1) defendant made a

18

representation; (2) the representation concerned a material fact; (3) the representation was false; (4) defendant made the representation with the intent to cause plaintiff to rely on it; (5) plaintiff reasonably relied on the representation; (6) injury resulted; and (7) plaintiff and defendant are in a fiduciary or confidential relationship." *Reyes v. Reyes*, No. 11 Civ. 2536, 2012 WL 4058037, at *11 (E.D.N.Y. Sept. 14, 2012).  Wells Fargo is entitled to summary judgment on these claims based on the above finding of a lack of evidence supporting any misrepresentation, which is an essential element of each of these claims.

### 3.    Breach of Contract Claim

LBBW's surviving breach of contract theory against Wachovia relies on allegations that Defendants agreed to notify it of any material changes to the CDO's capital structure.  *LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 513-14.  LBBW's theory that the internal markdown of the Preference Shares alone constitutes a "material change" (Dkt. No. 215 at 9, 22) is unworkable, and LBBW provides no alternative theory of Wachovia's failure to notify.  As explained above, the evidence establishes beyond genuine dispute that the internal markdown on the Preference Shares was not related to any change in Wachovia's view of GAII's underlying portfolio of assets.  In fact, it was not directly related to the valuation of the portfolio of assets at all— changed or unchanged.  LBBW's breach of contract claim cannot, therefore, survive summary judgment.

What is more, the Offering Circular disclaimed any duty on Defendants' part to notify prospective investors of any "update" or revision to "any projections, including any revisions to reflect changes in the economic conditions or other circumstances."  (*See* SOF ¶¶ 52, 90.)  As a result, the Court held in its Opinion and Order at the motion-to-dismiss stage that any breach of contract theory would depend on discovery's turning up evidence of some promise outside the

four corners of the Offering Circular. *LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 514. Discovery has not produced evidence of any such promises. (SOF ¶ 76.) LBBW's claim therefore cannot be sustained.

**4.    Claims Against Fortis**

Fortis also moves for summary judgment on the three claims remaining against it: fraud, constructive fraud, and negligent misrepresentation. In its earlier Opinion and Order granting in part and denying in part Defendants' motion to dismiss, this Court made clear that claims against Fortis could survive based on the relationship between Fortis and Wachovia, as collaborators on GAII. *LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 522-24. That is, the claims against Fortis relied on a finding that Wachovia had engaged in wrongdoing, and a further finding that Fortis had known or acted in support of any missteps. Based, then, on the above conclusion that the LBBW's claims against Wachovia cannot survive, the claims against Fortis also fail.

**IV.    Additional Motions**

**A.    Motion to Supplement the Summary Judgment Record**

LBBW's motion to supplement the summary judgment record is DENIED as untimely. (Dkt. Nos. 295, 298.) LBBW elected to move forward with summary judgment, representing to the Court that outstanding discovery disputes would not "implicate at all" the anticipated summary judgment motions that Defendants intended to and ultimately did file. (Dkt. No. 176 at 7:1-9:19.) Given that representation, LBBW cannot seek to reopen the record months after the motions for summary judgment had been fully briefed. Moreover, LBBW has also represented to the Court that the material it seeks to add to the record is not necessary to the resolution of the present motions. (Dkt. No. 305 at 22:10-12 ("[W]e think the summary judgment could be just decided without the rest of it . . . .").)

   B.     **Motions to Strike**

   LBBW's motion to strike exhibits attached to Defendants' motions for summary

judgment, as well as the Declarations of Jayant W. Tambe and Georges Wirtz, is DENIED.

(Dkt. No. 225; Dkt. No. 239.)

   Having reviewed the submissions on this motion, the Court finds that the exhibits are

sufficiently authenticated through their production during discovery, *see U.S. Info. Sys., Inc. v.*

*Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763, 2006 WL 2136249, at \*6

(S.D.N.Y. Aug. 1, 2006), and accompanying declarations, *see Am. Gen. Life. Ins. Co. v. Diana*

*Spira 2005 Irrevocable Life. Ins. Trust*, No. 08 Civ. 6843, 2014 WL 6694502, at \*1 (S.D.N.Y.

Nov. 25, 2014), or else because they are self-authenticating as official publications.  In any

event, the motion is additionally denied as moot, as the Court has resolved the motions for

summary judgment without relying on these exhibits.

   As to the Declarations, the Court finds that they admissible.  The Tambe Declaration

provides summaries of materials, including business records.  *See Am. Gen. Life Ins. Co.*, 2014

WL 6694502, at \*2.  The Wirtz Declaration is admissible because the declarant is not, contrary

to LBBW's contention, being offered as a Rule 26(a)(2) expert witness, and the Declaration

adequately demonstrates his personal knowledge.  *See Servaas Inc. v. Republic of Iraq*, 686 F.

Supp. 2d 346, 355 (S.D.N.Y. 2010).  The Tambe Declaration and the Wirtz Declaration are

therefore received by the Court.  The motion is further denied as moot, as the Court has resolved

the summary judgment motions without relying on these Declarations.

   Having reviewed the submissions by the parties, the Court further DENIES LBBW's

motion to strike certain of Defendants' arguments; LBBW had ample opportunity to address its

concerns in its own summary judgment briefing.  (*See* Dkt. No. 220 at 23-24 (demonstrating that

Defendants raised the objected-to arguments in their opening briefs.)) The Court further DENIES LBBW's motion to strike Defendants' replies to LBBW's responsive 56.1 Statement. *See In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 260 (S.D.N.Y. 2014) ("The rules of the Court neither require nor forbid such a statement, *see* Local Civil Rule 56.1, and courts in the Second Circuit routinely receive such replies."), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016).

> C.   **Motion for Adverse Inference Sanctions**

Based on its review of the parties' submissions, the Court DENIES LBBW's motion for adverse inference sanctions. (Dkt. No. 283.) This Court has previously declined to issue sanctions based on LBBW's representation of allegedly missing documents that Wells Fargo failed to produce, and the Court does not find the presently pending motion to warrant a different outcome. (*See* Dkt. No. 275 at 3.) Accordingly, the Court further declines to impose monetary sanctions or award attorneys' fees in connection with this motion.

**V.   Conclusion**

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED. The motion to supplement the summary judgment record is DENIED. The motions to strike are DENIED. The motion for adverse inference sanctions is DENIED.

The Clerk of the Court is directed to close the motions at Docket Number 213, 214, 225, 239, 283, 295, and 298, and to close the case.

SO ORDERED.

Dated: March 30, 2017
New York, New York

J. PAUL OETKEN
United States District Judge

22